**WALT DISNEY PRODUCTIONS**, a corporation, Plaintiff,

v.

**FRED A. NILES COMMUNICATION CENTER, INC.**, a corporation, Fred A. Niles, Behrend's, Inc., a corporation, and Jack Behrend, Defendants.

No. 64 C 883.

United States District Court
N. D. Illinois, E. D.

March 16, 1966.

Francis A. Utecht, Long Beach, Cal., Francis A. Even, Anderson, Luedeka, Fitch, Even & Tabin, Chicago, Ill., for plaintiff.

Owen J. Ooms, Chicago, Ill., for defendants.

DECKER, District Judge.

This is a suit for infringement of United States Patent No. 3,118,340, entitled "Panoramic Motion Picture Camera Arrangement." The patent was applied for on August 26, 1960, and issued on January 21, 1964, to Ub Iwerks who has assigned all right, title and interest in it to plaintiff.

Plaintiff, Walt Disney Productions, is a corporation organized and existing under the laws of the State of California. Defendant, Fred A. Niles Communication Center, Inc., is a corporation organized and existing under the laws of the State of Illinois. Defendant Behrend's, Inc. is also an Illinois corporation. Individual defendants Fred A. Niles and Jack Behrend are individuals residing in the State of Illinois.

Plaintiff seeks an adjudication that Claim 8 of the patent has been infringed by defendants. Defendants argue: (1) that the patent is invalid because it fails the test of nonobviousness under 35 U.S.C. § 103; (2) that its specification and claims are insufficient under 35 U.S.C. § 112; and (3) that there was no infringment even if the patent is valid. Defendants also counterclaim for unfair competition.

This Court has jurisdiction of this suit based upon the patent laws of the United States, 35 U.S.C. §§ 271 and 281, and 28 U.S.C. § 1338.

A trial was held by the Court, and this opinion is based upon the evidence introduced at that trial and the briefs filed by the parties.

I.

The patent contains eight claims; but they may all fairly be represented by Claim 8, which reads as follows:

"A motion picture camera assembly for photographing a panoramic scene comprising:

"a support;

"a plurality of motion picture cameras mounted on said support, said cameras being spaced equi-distant about a substantially horizontal

circle and with their optical axes substantially vertical; and

"a reflecting surface for each of said cameras mounted on said support at substantially a 45° angle to the horizontal and vertical so as to render the optical axes of said cameras effectively horizontal and projecting radially outwardly, the edges of each reflecting surface being immediately adjacent the edges of its neighboring surfaces, the distance along the optical axes from the camera lenses to the associated reflecting surface being substantially equal to the horizontal radial distance from the optical axes to the center of the circle so as to place said camera lenses in substantial optical coincidence at the center of said circle whereby each camera photographs substantially a true sector field with the sides thereof in substantial coincidence to avoid gaps between the individual camera fields."

This patented rig photographs a 360-degree panoramic motion picture through a plurality of cameras, each of which photographs one "sector field" of the panorama. The problem in 360-degree photography to which the patent is addressed is the difficulty in matching adjacent sector fields at their boundaries.

In the prior "back-to-back" 360–degree rigs, cameras are mounted horizontally around a circle, each pointing directly away from the center of the circle. Since each camera lens is displaced from the circle's center by several inches, each photographs its sector field from a slightly different positon than the others, resulting in the problems of parallax. At points near the camera, adjacent sector fields are separated by gaps; at points distant from the camera, adjacent sector fields overlap. Objects lying in a gap appear on the film of no camera and are lost in projection; distant objects lying in an overlap appear on the film in two cameras resulting in double images in projection. Such problems are unavoidable in a "back-to-back" system because it is phy-

sically impossible to place several lenses and their associated camera hardware at the single center point.

Plaintiff's rig overcomes these problems by making the effective point-of-view of all cameras lie at the center of the circle. Mirrors fold the optical axis of each camera down into the camera below, and if the distance from mirror to camera is the same as the distance from mirror to the center of the circle, the illusion is produced of photographing from the center point. When the elements of the rig are thus properly spaced, adjacent sector field boundaries coincide: there are no gaps or overlaps. Omissions and double images are eliminated. The question is whether a rig that accomplishes these results in this way is patentable over the prior art.

■■ The patent is presumed valid. 35 U.S.C. § 282. "This presumption is not an idle gesture * * * and is not to be overthrown except by clear and cogent evidence." Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 777 (7th Cir. 1961). The presumption is strengthened where the validity of the patent is challenged on the basis of prior art cited by the Patent Office. Shumaker v. Gem Mfg. Co., 311 F.2d 273, 275 (7th Cir. 1962). Conversely, the presumption is "greatly weakened" where relevant prior art has not been cited by the Patent Office. Milton Mfg. Co. v. Potter-Weil Corp., 327 F.2d 437, 439 (7th Cir. 1964). However, where the Patent Office cites one patent but not other similar ones, the presumption is weakened only to the extent that the teaching of the uncited patents is not disclosed in the cited patent.

■ In accordance with these rules, a successful attack on the validity of the patent under 35 U.S.C. § 103 requires defendants to show that

" * * * the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill

in the art to which said subject matter pertains.

The requirements of § 103 must be strictly observed. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

■ Complete anticipation in the prior art need not be shown, nor by the very terms of § 103 need a single prior art patent be cited which contains all of the elements of the patented device. Graham v. John Deere Co., supra at 86 S.Ct. 684; Pleatmaster, Inc. v. Golding Mfg. Co., 240 F.2d 894, 897 (7th Cir. 1957). For patents such as the one in suit, which cover a combination of known elements, § 103 imposes a "rather severe test." Toro Mfg. Co. v. Jacobsen Mfg. Co., 357 F.2d 901 (7th Cir. 1966); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151–152, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

■ The patent is to be tested against the prior art as it stood at the time of the invention, whether or not the inventor was aware of it. "It is * * * irrelevant that no one apparently chose to avail themselves of knowledge stored to the Patent Office and readily available by the simple expedient of conducting a patent search—a prudent and nowadays common preliminary to well organized research." Calmar, Inc. v. Cook Chemical Co., 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966).

A review of the prior art shows clearly that the presumption of validity has been overcome in this case and that the patented arrangement would have been obvious at the time it was designed to one skilled in the relevant art. Defendants' expert witness, Professor Fielding, a person qualified in the history and technique of special effects motion picture photography, described the prior art and showed its strong similarities to elements of plaintiff's rig.

A plurality of motion picture cameras for 360-degree panoramic photography was used in 1900 at the Paris Exposition by a Frenchman, Raoul Grimoin-Sanson. This was the prior "back-to-back" arrangement which has been patented and used commercially by plaintiff at Disneyland. Since that time, several versions of panoramic motion pictures have been shown, most of them presenting a field of substantially smaller scope than an entire 360-degree field.

From the beginning, the problems of parallax which plaintiff's rig overcomes were evident in systems that used a plurality of cameras to photograph a panoramic field. The prior art solves these problems through the use of mirrors. Two patents issued to Phillip Smith show how to accomplish this in a system of three cameras.[1] In one of these patents, inventor Smith identifies one of his problems as the parallax effects produced when physically displaced lenses are used to photograph adjacent sector fields: "There can be duplication or omission in the boundary regions."[2] He overcame these difficulties by using a center camera to view the sector field directly in front of it, and a camera on each side to view a side sector field through a mirror. The spacing relationship between the side cameras and their associated mirrors was such that the illusion was produced of all three cameras photographing from the same center point. Inventor Smith said he had designed a system in which "a plurality of cameras view a scene to be photographed as from a single point, each camera photographing a different portion of the field."[3] Gaps and double images were thereby avoided.

A similar arrangement appears in United States Patent No. 2,931,267, is-

---

1. No. 2,896,503, issued July 28, 1959; No. 2,918,843, issued December 29, 1959. Two more related Smith patents were issued after plaintiff's patent was applied for on August 26, 1960, and do not qualify as prior art on the issue of obviousness.

They are: No. 3,023,666, issued March 6, 1962; No. 3,031,920, issued May 1, 1962.

2. No. 2,896,503, Col. 1, lines 50–51.

3. No. 2,918,843, Col. 1, lines 24–26.

sued to W. C. Hoch on April 5, 1960 (more than four months before plaintiff's inventor applied for his patent), in an early French patent, No. 385,423, issued on March 16, 1908 to the Societe des Phonographes et Cinematographes; and in the "Cinemiracle" and "Cinerama" processes used prior to 1958. An illustration from the French patent, which states that it was designed to overcome the fact that "certain parts of the objects are seen doubly or certain parts are missing"[4] under older systems, shows the physical arrangement of cameras and mirrors which avoids the effects of parallax.[5]

The precise spacing relationship between elements required to avoid gaps and double images is described in greatest detail in Hoch.[6] The same unambiguous teaching is available to a person skilled in the art in Smith and the Societe des Phonographes patent. The extension of this principle to more cameras photographing more sector fields of a larger panorama produces no new quality or function; this application of the prior art is wanting in any unusual or sur-

4. " * * * sont vus déformés parce que certaines parties de ces objets sont vues en double ou présentent des parties manquantes * * *." Col. 2, lines 34–36. The parties have stipulated to the translation. (Stip. 8.)

5. "For the practical realization of this mode of operation with three cinematographic instruments, for example, light rays are directed to the distance in the direction of parts d, e and h, i of the panorama or of the scene, the reflectors m and n reflecting the said rays in the cinematographic instruments b and c, instrument *a* being arranged as usual for taking a direct picture; in this case all the rays in the direction of the various parts of the panorama seem to converge towards the optical center k of the system composed of the three instruments, and the three pictures taken are then juxtaposable along the entire line of junction." French Patent No. 385,423, Col. 2, line 51 through Col. 3, line 12. Translation stipulated to by parties. (Stip. 8.)

6. No. 2,931,267, Col. 5, lines 29–41.

prising consequences. See Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127 (1950); Toro Mfg. Corp. v. Jacobsen Mfg. Co., 357 F.2d 901, (7th Cir. 1966).[7]

All that is left to plaintiff's claim is the vertical placement of the cameras below the mirrors rather than next to them. Of course, the principle taught in Smith, Hoch and Societe des Phonographes cannot be applied without modification to the 360-degree problem. As defendants' expert testified, additional cameras cannot be placed around a horizontal circle viewing additional sector fields of a wider panorama through mirrors because the addition of a very few cameras to the system results in cameras photographing one another. It is no overstatement to say that it is physically impossible to apply the prior art directly.

Faced with this physical impasse, inventor Iwerks dropped the cameras out of sight. He did the only thing he could do: he removed the cameras from the plane in which the pictures were to be taken. Given the prior art which taught that gaps and double images could be avoided only by producing the illusion of photography by all cameras from the single point, the placement of cameras below the mirrors rather than next to them was obvious. The testimony of defendants' expert shows that a person faced with the problem would be obliged to do just that.

Prior art patents relating to 360-degree panoramic motion picture photography would teach this inevitable point to an inventor who did not immediately grasp it. In United States Patent No. 2,304,-434, issued to W. A. Ayres on December 8, 1942, a single camera photographs the surrounding field by pointing up into a hemispherical or conical mirror. Similarly, French Patent No. 704,471, issued to M. Grimoin-Sanson on February 23, 1931, shows a single projector pointing up into a conical mirror.

Finally, United States Patent No. 2,-794,379, issued on June 4, 1957, to G. T. McNeil, shows an arrangement for taking a panoramic 360-degree *still* photograph. A single still camera points up into a mirror and the entire assembly rotates around a central axis, ultimately viewing an entire 360-degree field. The mirror is located in the same relationship to the other elements of the arrangement as plaintiff's mirror to produce the illusion of photography from the center of the circle regardless of the position of the rotating assembly.

McNeil is distinguishable from plaintiff's rig: it uses a single still camera and does not explicitly address itself to the problems of parallax. However, plaintiff's rig appears to be nothing more than a duplication of McNeil nine times around a circle with motion picture cameras. Furthermore, in one complete rotation, the mirror in McNeil describes a solid "frusto-conical" shape similar to the configuration of plaintiff's mirrors. McNeil clearly teaches a person skilled in the art how to place a camera in vertical relationship to a mirror for the purposes of 360-degree photography.[8]

■■ The presumption of validity attaching to this patent, somewhat strengthened by citations of prior art by the Patent Office, is clearly overcome. While the prior art does not directly anticipate plaintiff's rig, it provides a person skilled in the art with more than enough information to assemble plaintiff's rig out of the old elements which it contains. The prior art clearly and precisely teaches a person skilled in the art

7. None of the Smith patents was cited by the Patent Office, but Hoch and Societe des Phonographes were. Since all of these patents deal with substantially the same basic principle and teach a person skilled in the art how to use it, failure to cite the Smith patents does not weaken the presumption of validity.

8. Ayres and Grimoin-Sanson were not cited by the Patent Office; McNeil was cited. For the purposes of this suit, however, the three patents relate to the same basic principle and the presumption of validity is not weakened by the failure to cite Ayres and Grimoin-Sanson.

how to overcome the problems of parallax which troubled plaintiff's inventor. The prior art unequivocally shows how to create the required illusion of photography from a single point by a plurality of cameras and how, thereby, to avoid gaps and double images at the boundaries between sector fields. The simple physics of the problem requires placement of the cameras below the mirrors, rather than next to them, in a 360-degree rig. The prior art would lead a person skilled in the art to the same conclusion. Finally, the prior art teaches a person skilled in the art how to arrange a camera and a mirror in vertical relationship for 360-degree panoramic photography. The prior art does not show a device identical to plaintiff's; but, it provides a wealth of learning from which a person skilled in the art could easily construct plaintiff's rig. In short, plaintiff's combination of known elements produces no unusual or surprising result and is therefore not entitled to a patent.

Direct evidence on the question of obviousness is in conflict. Defendants' expert witness testified that the arrangement built by plaintiff would have been obvious to one skilled in the art in light of the extensive prior art, about which he testified in detail, and the physical requirements of the problem. Plaintiff's inventor, a person skilled in the precise art involved here, testified that he engaged in expensive research, including primarily the building of a "back-to-back" arrangement, before developing the patented rig. This prior effort is urged by plaintiff as evidence that the patented rig was not obvious to its inventor.

However, the evidence shows that inventor Iwerks was not as familiar with the prior art as defendants' expert. Furthermore, the expensive development of the "back-to-back" rig upon which plaintiff now relies took place before the prior art Smith, Hoch, and McNeil patents were issued. Consequently, I find that the opinion of defendants' expert is entitled to more weight. That opinion is abundantly supported by an analysis of the prior art.

Plaintiff primarily relies on the common subtests of nonobviousness. "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). However, in a case where there is clear proof of invalidity, these factors cannot tip the balance. See Kennatrack Corp. v. Stanley Works, 314 F.2d 164, 168 (7th Cir. 1963); Akron Brass Co. v. Elkhart Brass Mfg. Co., 353 F.2d 704, 707 (7th Cir. 1965). This is such a case.

Furthermore, there is little evidence in the record to support plaintiff's reliance on these factors. The evidence of commercial success consists of three contracts in the period since 1960, and the recent replacement in plaintiff's Disneyland of a "back-to-back" motion picture by one produced with the patented rig, more than five years after that rig was developed. (There is an unresolved controversy over whether the three contracts are in fact licensing agreements.) Some indication of success might be gleaned from this evidence, but it is far short of what would be needed to overcome other evidence of obviousness.

A felt need of some duration for an advancement in the art is shown weakly by a small amount of circumstantial evidence. Plaintiff's entire argument on this point is that "the use of multiple cameras for panoramic picture taking dates back to the very beginning of the motion picture industry in 1900." The use of panoramic systems, however, has been almost entirely restricted to small-scope systems suitable for projection in an ordinary theatre. Defendants' expert testified that 360-degree photography is a novelty, "appearing briefly at expositions and world's fairs * * * for a limited engagement." There may have been a long-standing felt need for advancement in the widely-used small scope sys-

tem; but that is not relevant to the sporadically-used, special event 360-degree systems.

■■ Evidence of a felt need for advancement must be derived from the history of 360-degree systems. Plaintiff appears to confuse interest in 360-degree panoramic photography with desire for advancement. Several 360-degree systems were used in the early years of the motion picture industry and plaintiff has used a "back-to-back" system at Disneyland. But use alone does not prove a desire for improvement. The only circumstantial evidence available is the issuance of two patents—in 1931 and 1942—for new 360-degree methods. In addition, it may be reasonable to infer that, since 360-degree photography was plagued with problems of parallax, there was a felt need for improvement; but that inference, plus the two patents, adds up to a weak case. The record does not contain sufficient evidence on this point to overturn the substantial evidence of obviousness.

An extensive search for an improved system and failures of others are not shown by the evidence. Plaintiff devotes one sentence to this point, simply citing "the many examples of prior art reviewed by Professor Fielding at the trial." Of course, prior art not dealing with 360-degree photography must be excluded from consideration. The evidence shows several very early systems, the 1931 and 1942 patents and plaintiff's "back-to-back" system. There is no evidence that anyone other than plaintiff was working on the 360-degree photography problem, or that anyone working on it had tried and failed, or even that plaintiff's inventor had tried and failed. The record shows several long-past efforts in the field and the recent constructions by plaintiff and defendants; but no extensive search appears.

■ The evidence shows that the rig described in plaintiff's patent would have been obvious to a person skilled in the relevant art. The evidence strongly supports this conclusion based on the prior art while offering little support for

plaintiff on the secondary tests of nonobviousness. The presumption of validity is clearly overcome and therefore the patent must be held invalid. There can be no infringement of an invalid patent, *Toro Mfg. Co.*, supra, and therefore all relief sought by plaintiff is denied.

## II.

Defendants also urge that the patent is invalid because it violates the requirements of 35 U.S.C. § 112 that it describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make and use the same," and that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

The patent relates to an arrangement of elements in an optical system designed to achieve a precise optical result. Defendants point out that in describing the critical relationships of elements, the patent uses the imprecise term "camera lenses" where the precise term "lens nodal points" would be uniquely appropriate. Furthermore, the measurements of critical distances between elements are qualified by the word "substantially," which defendants claim denies them the required precision.

■ Patent claims and specifications are addressed to those skilled in the art. *Briggs v. M & J Diesel Filter Co.*, 342 F.2d 573, 578 (7th Cir. 1965). "The fact that experimentation or the exercise of judgment is necessary to adapt a patented process to particular material or to obtain the particular results desired does not impair validity of the patent." *Binks Mfg. Co. v. Ransburg Electro-Coating Corp.*, 281 F.2d 252, 256–257 (7th Cir. 1960). "The fact that a patent would use such terms or, to the converse, omit such terms as would then render it incomprehensible to a layman would not of necessity render it invalid. It is only when those skilled in the art are unable to determine the extent, purpose or rationale of the invention from a study of the patent that it may be said the patent is

vague and indefinite and, therefore, invalid." Hazeltine Research, Inc. v. Dage Electric Co., Inc., 271 F.2d 218, 220 (7th Cir. 1959).

With respect to the use of the term "camera lenses" instead of the more precise technical term "lens nodal points," defendants' expert witness testified as follows:

"Q. You stated in your testimony that the term 'nodal point' does not appear in the patent in suit and therefore to you the patent in suit was not precise in this regard.

"A. Yes.

"Q. However, you had no trouble determining that the point on the lens referred to in the patent in this suit was the nodal point, did you?

"A. I had no trouble, but there is a good reason why I did not, which is in my work. I have been dealing for many years with nodal points. I have been working for about ten years in special effects cinematography and this is one of the very peculiar, very few areas of motion picture work in which nodal points are crucially important. It has nothing to do with the conventional state of the photographic art.

"Q. Do you consider 360-degree motion picture art conventional?

"A. No, no, no."

The testimony of defendant Jack Behrend, also a person skilled in the relevant art, shows that he, too, would have no difficulty in reading "camera lens" to require measurements from the lens nodal point. Finally, plaintiff's inventor testified that a reference to the lens in this context would bring the nodal point to his mind.

■ On the basis of the testimony of experts for both sides, I conclude that the failure to use the term "lens nodal point" in either specification or claim does not

make this patent fatally defective under 35 U.S.C. § 112. I reach this conclusion despite the fact that this precise technical term is commonly used in patents in this art, and despite the fact that its use in this patent would have been desirable.

■ With respect to the use of the word "substantially" to qualify the specifications of certain critical distances in the patent, the evidence shows that one skilled in the relevant art would correctly perceive the limits of plaintiff's claim. The testimony of defendant Jack Behrend shows that a person skilled in the art would know when the magnitude of variation from the prescribed distances would defeat the stated purpose of the invention. Defendants suggest in their brief that the patent could be read to extend to variations of several inches. However, such gross variations clearly go beyond the claim in light of the purpose of the invention. The use of the term "substantially" does not make the patent in suit indefinite and invalid under the standards of 35 U.S.C. § 112. This conclusion is consistent with the ruling in Briggs v. M. & J. Diesel Locomotive Filter Corp., 342 F.2d 573, 578–579 (7th Cir. 1965).

### III.

■ I come now to the question of infringement of Claim 8 of the patent, the only claim upon which plaintiff relies in this suit. On the basis of the evidence I conclude that if the patent were valid, it would be infringed by the accused rig. "The test of infringement must be the use by defendant of the inventive features of the patent in suit. * * * It is well established in patent law that if two devices do the same work in substantially the same way and accomplish the same result, they are the same." Elgen Mfg. Corp. v. Ventfabrics, Inc., 314 F.2d 440, 443–444 (7th Cir. 1963). Accord, Hunt v. Armour & Co., 185 F.2d 722, 728 (7th Cir. 1951).

Defendants admit that the accused rig includes each of the structural elements set forth in Claim 8. The only basic

structural difference relied on to avoid infringement is a variation of the spacing relationship between each camera and its associated mirror. In plaintiff's rig, the nodal point of each camera lens is located as far from the mirror as the mirror is from the center of the circle. Each lens thereby views its sector field as if from the center of the circle, and gaps and double images are avoided. Defendants have moved the lens nodal point approximately one-half inch closer to the mirror.

The accused rig nonetheless achieves plaintiff's goal of avoiding gaps. Defendants' expert witness Professor Fielding so testified; defendant Jack Behrend testified as follows:

> "Q. Now, when the defendants' accused camera is employed to make a photograph, do you not avoid gaps between the individual camera fields?
>
> "A. We do avoid gaps."

The accused rig also achieves plaintiff's goal of avoiding double images.[9] While Claim 8 does not specifically mention overlap, the specifications and inventor Iwerks' testimony clearly show that avoidance of double images was one purpose of the patent. Defendants pursue their primary defense on the ground that the accused rig differs from the patented rig in *purposely* producing overlap by moving the lens nodal point of each camera closer to its associated mirror.

Defendants' rig provides exactly the kind of overlap with double images which plaintiff's rig is designed to avoid; however, it does so in a way that does not save it from infringement. When sector field boundaries cross, the fields overlap and double images necessarily result. In a "back-to-back" rig, the boundaries cross at a point some distance from the camera causing overlap only in the background of each sector field; double images result only of distant objects. Plaintiff's rig eliminates all crossing of boundary lines, with the result that overlap and double images cannot occur. With the accused rig, boundary lines cross at a point very near the camera lens, resulting in overlap along substantially the entire length of the sector field boundaries; double images are produced of objects lying anywhere from the foreground to infinity. This phenomenon is physically identical to that which plagued the "back-to-back" rigs, but it occurs at a point closer to the camera.

The significance of the point at which overlap begins is in projection of the finished films. Where overlap is present along the entire boundaries of sector fields, it is a technically simple matter to mask one of the double images. No double images reach the screen. Where overlap is present only along a portion of the sector field boundaries producing double images only of distant objects, masking is not technically feasible. The distracting double images reach the screen.[10]

Overlap was designed into the accused rig to meet the requirements of a projection system somewhat different from plaintiff's projection system. No further significance of defendants' modification appears from the evidence. The evidence shows, however, that the accused rig was designed to produce the same results achieved by plaintiff's rig: the avoidance

9. Professor Fielding testified as follows:
   "Q. The accused structure also eliminates double images of objects at remote points from the cameras, too, does it not?
   "A. It eliminates double images not only of distant objects but of close objects, yes."

10. Professor Fielding testified as follows:
   "Q. Now, is it not true that the patent in suit, then, when referring to undesirable overlaps, is referring to the type of overlaps that cannot be cured by masking?
   "A. It is referring to double images which cannot be cured by masking, yes.
   "Q. So that is not the same kind of overlap which the defendants purposely achieved in their accused structure, is it?
   "A. No, they are providing a redundancy of information, visual information, which allows for convenient, feasible masking down which will not produce double images."

of gaps and double images.[11] Furthermore, the evidence shows that defendants could not have built a successful rig without using plaintiff's basic structural idea; no other known structure would avoid gaps and double images and permit a continuous panoramic 360-degree picture. The minor adjustment in the spacing relationship between elements of the rig to meet idiosyncrasies of a particular projection system does not avoid the paramount fact that defendants produce the same result that plaintiff produces using the same equipment in substantially the same way. For this reason, the accused rig infringes plaintiff's patent.

Finally, defendants urge the doctrine of file wrapper estoppel as a defense to the charge of infringement. "File wrapper estoppel arises only through amendment and cancellation of claims to overcome rejection, and the court will look no further than to learn whether the patentee seeking to disavow an element of his claim was forced to introduce such element to avoid rejection." Taylor-Reed Corp. v. Mennen Food Products, Inc., 324 F.2d 108, 111 (7th Cir. 1963); and see, Calmer, Inc. v. Cook Chemical Co., 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

An examination of rejected Claim 9 and allowed Claim 10 in the file wrapper shows unequivocally that the patent would not have been issued without the following limitation:

> " * * * the distance along the optical axes from the camera lenses to the reflecting surfaces being substantially equal to the horizontal distance from the optical axes to the center of the circle whereby the camera lenses are placed in substantial optical coincidence at the center of said circle."

The broad Claim 9 description of an arrangement of cameras and mirrors without the critical specification of the spacing relationship which makes the rig work cannot be relied upon now for the charge of infringement.

However, plaintiff stands on the claim as limited with no attempt to disavow any part of it. The issue really raised here under the umbrella of "file wrapper estoppel" is whether the accused rig comes within the range circumscribed by the word "substantially" in the spacing relationship limitation. As I have already suggested, the word "substantially" is fenced in by the goals of the patent. Plaintiff is not freely roaming the broad unlimited countryside of Claim 9, jousting with every rig showing vertically oriented cameras and mirrors in a circle. Plaintiff charges infringement by a rig built within the narrow limits required to obtain specific results. Since defendants' rig comes within the scope of the limitation required by the Patent Office as a condition of issuing the patent, there can be no file wrapper estoppel in this case.

The evidence shows that defendants' rig accomplishes the same results as plaintiff's results in substantially the same way with the same equipment. Were the patent valid, it would be infringed.

### IV.

Defendants have filed a counterclaim charging unfair competition. However, no proof at the trial was directed to this issue, nor did defendants pursue it in their post-trial brief and proposed findings. I conclude that the counterclaim has been abandoned.

On the basis of the evidence presented by both sides in this case, and in accordance with the findings of fact and conclusions of law set forth in this opin-

---

11. Edward Schinke, who designed and built the accused rig, testified as follows:
"Q. Mr. Schinke, you heard Mr. Behrend state that the defendants' 360-degree camera arrangement was designed to eliminate gaps between individual adjoining camera fields; do you agree with that?

"A. Yes—well, that was one of the purposes.
"Q. Was another purpose to eliminate or produce a film that had no double images when it was projected?
"A. Naturally.
"Q. And both of these purposes were achieved in fact?
"A. I would say yes."

ion pursuant to F.R.Civ.P. 52(a), an order of judgment for the defendant has been entered today on the complaint for infringement of United States Patent No. 3,118,340, because the patent is invalid. An order dismissing defendants' counterclaim for unfair competition has also been entered today.